UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION


UNITED STATES OF AMERICA,   )   CASE NO:  7:16-CR-01164-1
   )
         Plaintiff,   )     CRIMINAL
   )
   vs.   )   McAllen, Texas
   )
DANIEL PEREZ,   )   Thursday, February 2, 2017
   )   (2:55 p.m. to 3:32 p.m.)
         Defendant.   )   (3:41 p.m. to 3:47 p.m.)


SENTENCING

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
CHIEF UNITED STATES DISTRICT JUDGE


(SEALED BENCH CONFERENCE OMITTED)



Appearances:        See Next Page

Court Recorder:        Antonio Tijerina

Transcribed by:        Exceptional Reporting Services, Inc.
        P.O. Box 18668
        Corpus Christi, TX 78480-8668
        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                    JESUS SALAZAR, ESQ.
                              Assistant United States Attorney
                              1701 W. Business Hwy. 83, Suite 600
                              McAllen, TX 78501

                              CHRISTOPHER J. CESTARO, ESQ.
                              U.S. Department of Justice
                              1301 New York Avenue, Suite LL02
                              Washington, DC 20005

Defendant:                    LEONARDO RINCONES, JR., ESQ.
                              Attorney at Law
                              854 E. Van Buren
                              Brownsville, TX 78520

U.S. Probation Office:        Norma Canales
                              1701 W. Business Hwy. 83
                              Suite 729
                              McAllen, TX 78501

1      <u>**McAllen, Texas; Thursday, February 2, 2017; 2:55 p.m.**</u>

2                          **(Call to Order)**

3           **THE COURT:**  Please be seated.

4           Criminal Number M-16-1164-01, *United States of*

5  *America versus Daniel Perez.*

6           **MR. SALAZAR:**  Good afternoon, your Honor.  Jesse

7  Salazar for the Government.  Appearing also for the Government

8  is Chris Cestaro, your Honor.

9           **MR. RINCONES:**  Good afternoon, your Honor.  Leonardo

10  Rincones for Mr. Perez, present and ready to proceed.

11          **THE COURT:**  Well, you all need to come up here.

12          **MR. RINCONES:**  Yes, your Honor.

13          **THE COURT:**  I guess my first question to the

14  Government is, there are two related cases where those

15  individuals pled to a charge that was a maximum of 10 years.

16  These defendants, the one today -- the two that are to be

17  sentenced today, pled to a charge of a maximum of five years.

18  However, when you look at the presentence reports of the ones

19  that pled to the 10 years and the ones that pled to the five

20  years, the 10-year statute guideline is much lower than the one

21  for the five-year maximum.  And, so, how -- how did you all

22  make that decision as to what people should plead to?  Plus,

23  it's my understanding that the ones that pled to the 10 years

24  are the ones that actually made money off of the transaction

25  and kept the money.  I wouldn't say that there's no benefit to

1    the two defendants that get sentenced today, because there is.

2    Obviously, they made the profit from their business.  And the

3    problem with the Foreign Corrupt Services (sic) Act, the

4    problem that it's trying to face is the unfair competition that

5    you get the business because you're giving somebody a kickback

6    even though you're still getting the price that you would have

7    made.  So, there is a -- a profit that is made by the two

8    defendants today, because they're owners of the company.  So,

9    it isn't like they don't make a profit and that the only ones

10   that were making money off of this were the people that were

11   paying -- getting the bribe paid to them.  But what is odd is

12   this very different guideline determination based on a crime

13   that has a lesser statutory maximum than the one with the 10

14   years.

15          **MR. CESTARO:**  And if I may address that, your Honor.

16          **THE COURT:**  Sure.

17          **MR. CESTARO:**  The individuals that were charged with

18   the 10-year maximum statute were both the foreign officials,

19   and they were both charged with money laundering.

20          **THE COURT:**  Right.

21          **MR. CESTARO:**  The -- one of the reasons for that is

22   under precedent in the Fifth Circuit, *United States versus*

23   *Castle*, the Fifth Circuit found that the foreign officials

24   themselves could not be --

25          **THE COURT:**  No.  This is direct -- the Foreign

5

1    <u>Corrupt Practices Act</u> is directed at Americans --

2         **MR. CESTARO:**  Yes.

3         **THE COURT:**  -- bribing somebody else --

4         **MR. CESTARO:**  And --

5         **THE COURT:**  -- to get their business.

6         **MR. CESTARO:**  And, so, the foreign officials could

7    not be charged with the underlying <u>Foreign Corrupt Practices</u>

8    <u>Act</u> violation.  Here -- and, so, they were charged with money

9    laundering.

10        **THE COURT:**  Because the whole purpose of the <u>Foreign</u>

11   <u>Corrupt Practices Act</u> is to prevent Americans from paying

12   bribes to some foreign companies to do business with them.

13        **MR. CESTARO:**  Americans, as well as individuals that

14   take actions in America, as well as individuals associated with

15   American entities.  Yes.  Exactly correct, your Honor.  And --

16        **THE COURT:**  But you have to be an American?

17        **MR. CESTARO:**  You do not have to be an American.

18        **THE COURT:**  Well, why would the other two not have

19   been doing business here when they would come and do business

20   with -- on this side of the border to go ahead and -- I mean,

21   they had to come at some point to do business with Hunt Pan Am,

22   right?

23        **MR. CESTARO:**  The foreign officials did come here and

24   did meet with the individuals.

25        **THE COURT:**  Okay.  Why would they be exempt from

1   coming under the Act if it's for people who do business in the

2   United States, not just --

3          **MR. CESTARO:**  They are exempt because they are the

4   Government officials in the -- the foreign entity -- in the

5   foreign country, in this case Mexico, and under the precedent

6   in the Fifth Circuit, which is *United States versus Castle*, the

7   Fifth Circuit held that those foreign officials could not be

8   co-conspirators to the underlying Foreign Corrupt Practices Act

9   crime.  And, so, they were charged with a different offense.

10  They were charged with money laundering.

11         **THE COURT:**  Right.  I understand that.  Which,

12  therefore, has a statutory maximum of 10 years.

13         **MR. CESTARO:**  Yes, your Honor.

14         **THE COURT:**  However, there is something wrong with a

15  guideline system that ends up with a much higher guideline

16  range for somebody who's convicted of a five-year maximum as

17  opposed to a 10-year maximum.

18         **MR. CESTARO:**  And the applicable guideline range in

19  this case was under 2C1.1, which has a different base offense

20  than the money laundering, and that --

21         **THE COURT:**  I know that, but --

22         **MR. CESTARO:**  -- caused the (indiscernible).

23         **THE COURT:**  I'm not criticizing you.

24         **MR. CESTARO:**  Yes.

25         **THE COURT:**  But I'm -- I think I have a right to say

7

1    something about the commission, having served on it for 12

2    years.

3           **MR. CESTARO:**  Yes, your Honor.

4           **THE COURT:**  But this is probably something that

5    should be brought to their attention, that you have a crime

6    that has a maximum punishment of five years, automatically

7    getting to way past the five years, with these amounts of

8    money, than you do with, in this case, basically, people who

9    are co-defendants of theirs, because they're partners in crime

10   with them.  And they get charged with something and the maximum

11   is 10 years, and somehow that guideline, money laundering

12   guideline, is lower than the -- the Foreign Corrupt Practices

13   Act guideline.  The reason I say that's an issue is because the

14   commission normally tries to do something with regards to what

15   the statutory maximums are and the statutory minimums; because

16   you just can't go out and dole out penalties -- ranges without

17   obvious serious deference to what congress has decided is the

18   maximum and the mandatory minimum in cases with mandatory

19   minimums.  And, so, that's the question here.  And did you all

20   think about that when you all decided what charges people were

21   going to get -- pleading to with regards to those two versus

22   these two?

23          **MR. CESTARO:**  We -- under the USAM, you know, charged

24   each individual with -- with what we thought was appropriate in

25   that specific matter.

1          **THE COURT:**  Okay.  But you also think that they

2     didn't make any money.  The business made money, right?  I

3     mean, the reason we have this is so that -- to protect all

4     businesses.  There might be somebody else that does the same

5     thing that Hunt Pan Am does, which is sell motors, or whatever

6     they do with regards to equipment for the aircraft.  By

7     agreeing to pay the, quote, "fee" that you pay, the referral

8     fee, or whatever you want to call it, you're basically making

9     sure that you get the business.  So, you are making business;

10    you are making money.  So, let's not play with this, "These

11    people weren't making any money."  They -- the bribe money was

12    kept by the referral people, and, yes, the -- the state, the

13    Mexican state, ended up losing money, because they ended up

14    paying a lot more than something would have been worth, but

15    there is a reason why somebody pays a referral fee, because

16    you're making the profit.  You're getting to sell your product.

17    And, yes, these people -- these two defendants did not keep any

18    of the bribe money, but they paid the bribe money so that their

19    business could keep on going and doing good business and

20    selling whatever equipment.  Otherwise, they wouldn't have paid

21    them.

22          **MR. CESTARO:**  Absolutely agree, your Honor.

23          **THE COURT:**  The only reason they participated in this

24    transaction, knowing full well that the poor people of the

25    state of Tamaulipas were going to be making the payment, was

9

1   because they wanted the business.

2           **MR. CESTARO:**  Absolutely agree, your Honor.

3           **THE COURT:**  And, so, there is a -- there is some

4   benefit derived by these two defendants with regards to this.

5   They didn't keep the bribe money, but they certainly got the

6   profits or -- they were both co-owners of the business or part

7   owners of the business, and so the business was doing well;

8   other than that, they wouldn't be paying all -- they wouldn't

9   go through the charade of giving them fake invoices so that --

10  and then going through the charade of also -- not charade, but

11  actually then taking that money and putting it in the bank

12  accounts of those Mexican officials.  So, you know, you do make

13  money here.

14          Mr. Perez, have you had an opportunity to review the

15  presentence investigation report that was prepared in your

16  case, sir?

17          **THE DEFENDANT:**  Yes, sir.

18          **THE COURT:**  Have you discussed it with your lawyer?

19          **THE DEFENDANT:**  Uh, we went through it, sir, but --

20          **THE COURT:**  If you haven't had enough time, you need

21  to tell me.

22          **THE DEFENDANT:**  No, sir.

23          **THE COURT:**  I can give you enough time.

24          **THE DEFENDANT:**  I had enough time, sir.

25          **THE COURT:**  Are you sure?

1          **THE DEFENDANT:**  Yes, your Honor.

2          **THE COURT:**  Well, then, why is it that you say,

3     "Well, we kind of went through it," but then you were going to

4     say something else?

5          **THE DEFENDANT:**  Pardon?

6          **THE COURT:**  Well, I asked you if you had -- if you

7     have visited with your lawyer about this, and you started off

8     by saying, "Well" -- well, does that mean you didn't really

9     visit with him about this or what?

10          **THE DEFENDANT:**  No, sir.  In detail I did visit with

11     him.

12          **THE COURT:**  Okay.  Is there anything you would like

13     to tell the Court about this report or anything else before I

14     make a decision as to what sentence to impose in your case?

15          **THE DEFENDANT:**  Uh, first, your Honor, I'd like to

16     apologize, because this -- to you, the Court, and, of course,

17     God; that there was a bad business -- bad business decision

18     that was made.  Okay?  And if I was given a second opportunity,

19     I would -- I would -- definitely would not make the same

20     choice.  I wouldn't even consider it, because being ignorant to

21     the laws -- because I was just -- I was just the director of

22     maintenance, and, you know, I -- I would have never ever,

23     ever --

24          **THE COURT:**  Well, you were the director of

25     maintenance, but also a part owner of the business, right?

1          THE DEFENDANT:  Shareholders, your Honor.

2          THE COURT:  Right.  A shareholder, part owner of the

3   business.

4          THE DEFENDANT:  Both -- both of us shareholders.

5          THE COURT:  What?

6          THE DEFENDANT:  Both.

7          THE COURT:  Both of you, but you were a part owner of

8   the business.

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  And you had worked there a long time.

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  And you were director of maintenance.

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  But as director of maintenance, you also

15  were the one that had personal contact with these two

16  individuals that were getting their kickbacks.

17         THE DEFENDANT:  Yes, your Honor, I was, for the

18  reason is that I was the only one -- well, not the only one,

19  but the one that spoke Spanish with them.

20         THE COURT:  I know, but, frankly, the other owners

21  had to have known this was going on.

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  I mean, they're not stupid businessmen.

24  I mean, they're businessmen.

25         THE DEFENDANT:  Uh-huh.

1          **THE COURT:**  And everybody knew that, "Well, we're --

2    we're going to inflate the prices because of the fact that we

3    have to pay them something."  I mean, none of you all were

4    inexperienced businessmen.

5          **THE DEFENDANT:**  No, sir.

6          **THE COURT:**  And you know you're doing business with

7    people from Mexico, and so you know that -- the practices of

8    some of the business situations in Mexico, and so it isn't like

9    people didn't know this was going to go on.  Right?

10         **THE DEFENDANT:**  Yes, sir.

11         **THE COURT:**  I mean, it wasn't just you; of course the

12   rest of them knew.

13         **THE DEFENDANT:**  Yes, sir.

14         **THE COURT:**  Okay.  So, what else would you like to

15   say?

16         **THE DEFENDANT:**  Well, like I was saying, you know --

17         **THE COURT:**  I mean that what they did to you is,

18   "Well, you go ahead and try to do the best deal and see what --

19   how much they want, and let's proceed in that fashion."

20   Because you're the one that dealt with them.

21         **THE DEFENDANT:**  Yes, sir.

22         **THE COURT:**  Right?

23         **THE DEFENDANT:**  Yes, sir.

24         **THE COURT:**  But everybody else knew that that was

25   part of what they expected you to do.

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  You didn't dream this up yourself.  I

3     mean --

4          THE DEFENDANT:  No, sir.

5          THE COURT:  -- everybody knew that that's how you did

6     business with these people from Mexico.

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  What nobody ever stops to think about is

9     that there will be corruption as long as people who are not

10    corrupt agree to pay these fees.  Your answer would be, "Well,

11    some other company would have done it anyway."  And, so, at

12    some point I guess the American government has decided, "Well,

13    we'll try to stop this by having the Foreign Corrupt Practices

14    Act, by trying to stop everybody from doing this."  Because the

15    answer would normally be, "I'm not doing anything else that

16    anybody else doesn't do.  And, so, I'm just playing by their

17    rules, whatever their rules are in Mexico as to how they do

18    business," and never mind that the citizens of Tamaulipas don't

19    get the kind of assistance that people get on this side of the

20    border or any of those other things, and that their government

21    is unable to provide certain things because people, in this

22    case, these individuals, were too busy taking it for

23    themselves.  It isn't like they were going to go use it to do

24    charitable work in the state of Tamaulipas.

25         THE DEFENDANT:  Yes, sir.

1        **THE COURT:**  But I don't think that you're the only

2  person in the company that knew that this was going on -- done,

3  that this was being done, simply because you were in charge of

4  the maintenance part.

5        **THE DEFENDANT:**  Correct.

6        **THE COURT:**  Okay.  So, what else do you want to say?

7        **THE DEFENDANT:**  Well, like I said, I have to

8  apologize to you and the Court and to God, sir.  I know that

9  I've done this bad business decision --

10        **THE COURT:**  Well, I can take a lot of credit, but I

11  can't make decisions for God.

12        **THE DEFENDANT:**  No, no.  I said I'm giving credit to

13  God.

14        **THE COURT:**  Yeah, I know.  I know, so --

15        **THE DEFENDANT:**  Okay.

16        **THE COURT:**  -- that's between you and God.

17        **THE DEFENDANT:**  Okay.

18        **THE COURT:**  I don't want to sort of --

19        **THE DEFENDANT:**  I've been an embarrass -- I

20  embarrassed my family, which are in the back of the courtroom,

21  sir, for --

22        **THE COURT:**  You're right.

23        **THE DEFENDANT:**  -- for -- for my decision.

24        **THE COURT:**  And I have letters from your family, just

25  like I have letters from the other defendant today.

1          **THE DEFENDANT:** Yes. So, I --

2          **THE COURT:** I have to tell you another thing. Not

3     that I'm in any way holding these against you; in fact, your

4     family is accomplished, just like the other defendant's family

5     is accomplished, but sometimes judges are put in a hard

6     situation. Sometimes when somebody has a very good family and

7     everything else, you think, well, there was no reason for you

8     to be doing this. Sometimes people with very difficult family

9     circumstances and inability to take care of certain things

10    financially or otherwise, it's no excuse, but -- so, you get

11    pulled in different directions as a judge as to how you take

12    these letters from family members. I do read them. I have to

13    tell you that. Both of you have very good families, and I

14    think both of you probably have families that are a little

15    surprised that I have to be the one making a decision as to

16    what happens here. They're used to you all making a lot of

17    good family decisions and probably wondering, "Well, how did

18    this happen," and your answer would be to them, I would be -- I

19    suspect, "Well, that's the way everybody does it; that's what

20    people do when they do business with people from Mexico."

21         **THE DEFENDANT:** You're right, your Honor, and -- and

22    like I said, it was a really, really bad business decision on

23    my part, and I take responsibility for my actions.

24         **THE COURT:** I guess you all have competitors in your

25    business with Hunt Pan Am.

1        **THE DEFENDANT:**  Yes, sir.  We have -- in Brownsville

2   we've got two, and, of course, we've got McAllen, Corpus; all

3   over the place.

4        **THE COURT:**  Right.  I mean, so, these people could

5   have gone to anybody.

6        **THE DEFENDANT:**  Yes, sir.

7        **THE COURT:**  And the concern by you was, "Well, if we

8   don't do it, somebody else is going to do it."

9        **THE DEFENDANT:**  Yes, sir.

10        **THE COURT:**  Or did you sort of negotiate with them

11   what the price was going to be for the fees?

12        **THE DEFENDANT:**  No, sir.

13        **THE COURT:**  So, who decided the fee amounts?

14        **THE DEFENDANT:**  They would -- they would come in,

15   okay; I would give them a quote, a correct quote, except --

16        **THE COURT:**  The one that you would normally give me

17   if I came in and said, "I want a motor for the airplane I

18   have."

19        **THE DEFENDANT:**  I would --

20        **THE COURT:**  Which I don't have, but --

21        **THE DEFENDANT:**  I would give you a quote, sir, and --

22   because it's no secret to anybody.  There's a book that's put

23   out okay?  It's like a classified ad book, and anybody can read

24   them there, 8 percent, 10 percent above cost, but -- they would

25   say, "This is how much I want."

1    **THE COURT:**  "This is how much I want it to cost," is

2    what they would tell you.

3    **THE DEFENDANT:**  Yes, sir.

4    **THE COURT:**  And then you would agree, knowing full

5    well that what that meant is that you were going to get your

6    price, and something was going to happen to the in between

7    amount.

8    **THE DEFENDANT:**  Well --

9    **THE COURT:**  Between your price and whatever they were

10   saying the price should be.

11   **THE DEFENDANT:**  Yes, sir.

12   **THE COURT:**  And do they just come out and tell you

13   that?  Or, obviously, there's a conversation of, "This is what

14   I want it to be, because I want to make my fee out of it."

15   **THE DEFENDANT:**  Well, your Honor, we -- we never

16   solicited their business, us calling them, or anything.  They

17   would call or come to us and say, "I want a quote of this," and

18   I presume -- I know for a fact, not presume, they would go to

19   different places and get quotes.

20   **THE COURT:**  Right.

21   **THE DEFENDANT:**  And from there --

22   **THE COURT:**  But did you ever --

23   **THE DEFENDANT:**  And from there --

24   **THE COURT:**  Did you ever have one of them say to your

25   real price, "Can we negotiate that price and make it lower?"

1          **THE DEFENDANT:**  Yes, sir.  Many times, sir, up to

2  this date.

3          **THE COURT:**  Okay.  And sometimes you would make it

4  lower, right?

5          **THE DEFENDANT:**  Yes, sir.

6          **THE COURT:**  Like, if I went in there, like if I go in

7  and buy a car, I'm going to try to negotiate a price lower than

8  what was originally quoted to me.

9          **THE DEFENDANT:**  Correct.

10         **THE COURT:**  Okay.  And they would do that with you

11  here.

12         **THE DEFENDANT:**  Yes, sir.

13         **THE COURT:**  And in those cases, if you lowered the

14  price, then how would you decide -- how would they decide how

15  much came to them?

16         **THE DEFENDANT:**  That -- for their part, I wouldn't

17  know.  They would just come up with a figure and say, you know,

18  "This is how much we expect."

19         **THE COURT:**  Okay.  But -- but that -- you would still

20  be stuck at what their first price was; it just meant that they

21  were going to keep more, because they were still going to ask

22  the state to pay whatever price they said they wanted in the

23  first place.

24         **THE DEFENDANT:**  I presume, sir.

25         **THE COURT:**  And, so, you still negotiated with them

1    for a lower price knowing full well that they might keep more.

2              **THE DEFENDANT:**  Yes, sir.

3              **THE COURT:**  And all you -- you and your company ever

4    got out of it was that you made the sale.

5              **THE DEFENDANT:**  Yes, sir.

6              **THE COURT:**  And it was never that you upped the price

7    of what you would normally sell it to somebody; you just upped

8    the price if they wanted a higher amount listed as the price.

9              **THE DEFENDANT:**  Correct.

10             **THE COURT:**  So, what else do you want to say about

11   this report or anything else before I make a decision in your

12   case?

13             **THE DEFENDANT:**  Well, sir, that -- that -- that's it,

14   and all I ask is for -- I pray for consideration, leniency from

15   you on -- on my faith.

16             **THE COURT:**  Mr. Rincones, you, obviously, have

17   reviewed this report with your client?

18             **MR. RINCONES:**  I have, your Honor.

19             **THE COURT:**  Which, if any, objections do you still

20   need a ruling from the Court on, and what would you like to say

21   on his behalf here?

22             **MR. RINCONES:**  Your Honor, the only objection that we

23   need a ruling on is an objection number three that I filed in

24   writing.

25             **THE COURT:**  I mean, obviously, the Court is aware of

1    the Title 18, Section 3553(a) factors, which it needs to

2    consider in order to make a determination as to what the

3    appropriate sentence should be in this case.  Two of those

4    seven factors, (a)(4) and (a)(5), require consideration of the

5    guidelines, as well as the policy statements within the

6    guidelines.  I will, therefore, go ahead and determine and

7    calculate the policy -- the guidelines, as well as the -- and

8    then consider the policy statements, including grounds for

9    departure, and then after having done that, then I will

10   consider all of the applicable 3553(a) factors taken as a whole

11   in order to make the determination as to what the appropriate

12   sentence should be in this case.

13          Which, if any, objections do you still need a ruling

14   from the Court on, and what would you like to say on his behalf

15   here?

16          **MR. RINCONES:**  Your Honor, the only objection that I

17   need a ruling on is objection number three that was filed in

18   writing.  It is with regards to a four-level increase based on

19   the application of U.S. Sentencing Guidelines Section

20   2C1.1(b)(3).  It's paragraph number 46 of the original PSR.  In

21   that paragraph, your Honor, my client is assessed a four-level

22   increase based on the application of this section.  This

23   section specifically states that a four-level --

24          **THE COURT:**  Well, we know that they're not elected

25   public officials.

1            **MR. RINCONES:**  Correct, your Honor.

2            **THE COURT:**  And do we really consider them high-level

3    decision-making or sensitive positions?

4            **MR. RINCONES:**  We --

5            **THE COURT:**  I don't think so.

6            **MR. RINCONES:**  It is our position that they are not,

7    your Honor, like --

8            **THE COURT:**  Does the Government have a different view

9    about these two individuals?  I mean, are they really high-

10   level decision makers?  Well, they're not.  And are they -- a

11   sensitive position?

12           **MR. CESTARO:**  Your Honor, obviously, this is a very

13   fact-specific inquiry and case by case.  Here --

14           **THE COURT:**  Obviously, like every case, it is.

15           **MR. CESTARO:**  Yes.  And -- and here, as -- as the

16   Court noted, they are not elected officials.  And -- and they

17   didn't have final --

18           **THE COURT:**  Well, was the -- as the -- do you know

19   the commission actually gives us application notes?  And it

20   says:

21               "'High-level decision-making or sensitive position'

22               means a position characterized by a direct authority

23               to make decisions for, or on behalf of, a government

24               department, agency, or other government entity, or by

25               a substantial influence over the decision-making

22

1           process.  Examples of a public official in a high-

2           level decision-making position include a prosecuting

3           attorney, a judge, an agency administrator, and any

4           other public official with a similar level of

5           authority.  Examples of public officials who holds a

6           sensitive position include a juror, a law enforcement

7           officer, an election official, and any other

8           similarly situated individual."

9           It doesn't appear to me that the two individuals here

10   that were involved in taking the bribes are one that one would

11   consider in this public -- elected or any public official in a

12   high-level decision-making or sensitive position.  So, the

13   Court's going to go ahead and grant that objection.

14           **MR. RINCONES:**  Thank you, your Honor.

15           **THE COURT:**  So, what else do you want to say?

16           **MR. RINCONES:**  Your Honor, I did file a sealed motion

17   for a variance.  It is -- the motion is based on 3553, Sections

18   5H1.1 and 5H1.4, of the sentencing guidelines.  May I proceed

19   on that?

20           **THE COURT:**  Sure.  And why are you skipping to

21   variance?  There is nothing in the guideline manual that you

22   think helps you out here?

23           **MR. RINCONES:**  In the guideline manual?

24           **THE COURT:**  Yes.  So, what --

25           **MR. RINCONES:**  Well --

1          **THE COURT:**  Your -- your things for a variance are

2  going to be what?

3          **MR. RINCONES:**  Five H1.1 -- well, thirty-five -- all

4  the factors of 3553 --

5          **THE COURT:**  But that's not a variance.

6          **MR. RINCONES:**  Yes.

7          **THE COURT:**  If you're going to a 5H1.1, that's not a

8  variance.

9          **MR. RINCONES:**  Correct.  Under the guidelines, your

10  Honor, I would address Sections 5H1.1 and 5H1.4.  Five H1.1 has

11  to do with age.  We would submit to the Court that my client is

12  69 years of age.  He is working on 70 years of age.  He was

13  born in Brownsville, Texas, and has been a lifetime resident of

14  Brownsville, Texas.  He --

15          **THE COURT:**  Is there a policy statement about

16  Brownsville here?

17          **MR. RINCONES:**  No, your Honor.  I'm just making the

18  Court aware of that.  He graduated from the public schools of

19  Brownsville and attended community college for some time there,

20  a short period.  Right after that he enlisted in the U.S. Air

21  Force, back in January 19th of 1966.  It is there where he

22  started his career as an aircraft mechanic, and while -- while

23  in the air force he obtained the rank of staff sergeant and

24  received a Presidential Citation Award.  He was honorably

25  discharged back on November 28th of 1969.  We have submitted

1    some exhibits to the Court.  We --

2           **THE COURT:**  I saw them all.

3           **MR. RINCONES:**  We ask the Court to take that into

4    consideration.

5           **THE COURT:**  I did -- I do read everything that I get.

6           **MR. RINCONES:**  Mr. Perez, your Honor, married

7    Ms. Maria Belia (phonetic) Solis back in May 23rd of 1972.

8    That marriage remains intact to this date, and from that union

9    came four children.  I believe the Court has seen the letters

10   from Ms. --

11          **THE COURT:**  I saw this, and I've seen their

12   accomplishments.

13          **MR. RINCONES:**  -- Ms. Perez and -- and his children.

14   We ask the Court to take that into consideration.  It's

15   important to note that Ms. Perez is -- has -- has some pretty

16   severe spinal problems.

17          **THE COURT:**  I saw that.

18          **MR. RINCONES:**  To this date she has undergone a total

19   of four spinal surgeries.  We submitted a letter from her

20   doctor.

21          **THE COURT:**  I saw that.

22          **MR. RINCONES:**  We ask that the Court take

23   consideration of that.  Ms. Perez relies heavily on Mr. Perez

24   on day-to-day living operations, such as, you know -- you know,

25   caring for her, making sure she's taking the right medication,

1    taking her to the correct doctor, to doctor's appointments,

2    et cetera.

3            It's important to note that Mr. Perez also has

4    medical problems.  At 69 years of age he's not exactly in the

5    best of conditions.  A letter from Dr. Lenz describes his --

6            **THE COURT:**  I think Dr. Lenz wrote for both

7    defendants here.

8            **MR. RINCONES:**  Well, I'm not sure about that, your

9    Honor.  I haven't seen the other.

10           **THE COURT:**  Okay.  Go ahead.

11           **MR. RINCONES:**  But in this case Dr. Lenz states that

12   Mr. Perez has a mixed medical picture and describes that as --

13   him as having high cholesterol --

14           **THE COURT:**  That's not unusual.

15           **MR. RINCONES:**  -- heart disease, kidney disease,

16   hypertension, history of --

17           **THE COURT:**  I saw that, and actually your client had

18   a heart issue the day he pled guilty.

19           **MR. RINCONES:**  Yes, your Honor.  And --

20           **THE COURT:**  And, in fact, he was diagnosed with a

21   mild heart attack the day he pled guilty.

22           **MR. RINCONES:**  That is correct, your Honor.  And

23   that -- and that is information that I received from Dr. Jaime

24   Silva.

25           **THE COURT:**  And, Mr. Perez, that wasn't my fault, was

1    it?

2        **(Laughter)**

3            **THE DEFENDANT:**  No, sir.  No, sir.

4            **THE COURT:**  Okay.

5            **MR. RINCONES:**  Dr. Silva, who is his cardiologist,

6    describes his problems as those being of coronary artery

7    disease, as having a previous coronary stent, and non-ST

8    myocardial infraction (sic) --

9            **THE COURT:**  I -- I saw that.

10           **MR. RINCONES:**  In addition, he's got anxiety,

11   diabetes, hypertension.  As the Court noted, on the date that

12   he appeared before your Honor -- and not to the Court's fault;

13   he understands that this is all entirely on him -- he started

14   feeling bad on the drive back home.  As a result of that he

15   ended up in the hospital that night.  He ended up being

16   admitted and underwent a procedure to unclog his artery.

17           Mr. Perez has received character references, letters

18   from his bosses.  That would be Robert Harper, who is the

19   president --

20           **THE COURT:**  I saw Mr. Harper.  I think he wrote for

21   both of them.

22           **MR. RINCONES:**  -- and the vice president, Mr. Robert

23   Steenbock.

24           **THE COURT:**  Right.  I mean, but what do you expect

25   from them?  I mean, this is their company.  They were doing

1 well.  They were doing -- making business out of it.  I mean,

2 it's nice, but, then, these two men really had a lot to do with

3 running the company.

4            **MR. RINCONES:**  I understand, your Honor.

5            **THE COURT:**  And, you know, any success of the company

6 is really -- they were the ones actually running the company,

7 although I guess there were, like, 12 owners?  Isn't that how

8 many there are?

9            **THE DEFENDANT:**  Sir, at that time Mr. Harper --

10           **THE COURT:**  Right now it's 12, isn't it?

11           **THE DEFENDANT:**  No, sir.  Just Mr. Harper and

12 Steenbock.

13           **THE COURT:**  But now there's more.

14           **THE DEFENDANT:**  No.  No.

15           **MR. RINCONES:**  Now there's two.

16           **THE DEFENDANT:**  There are two -- two owners.

17           **THE COURT:**  There's not -- there weren't 12

18 shareholders at one time?

19           **THE DEFENDANT:**  At that time, where -- for this, this

20 incident happened, yes, sir.  But they --

21           **THE COURT:**  Yes.  There were 12 shareholders.

22           **THE DEFENDANT:**  But they bought -- yeah, but they

23 bought the company, and there are only two owners.

24           **THE COURT:**  Right; but they were shareholders with

25 you all at the time.

1          THE DEFENDANT:  No, sir.

2          THE COURT:  They were not.

3          THE DEFENDANT:  No, sir.

4          THE COURT:  So, they just bought the company as is.

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And, so, everybody that was a

7    shareholder, then, is no longer a shareholder.

8          THE DEFENDANT:  No, sir.

9          MR. RINCONES:  Correct.

10          THE COURT:  But you continued working there.

11          THE DEFENDANT:  Yes, sir.

12          MR. RINCONES:  Your Honor, and, as the Court points

13    out, you know, you must take their letters with caution, but

14    it's important to point out the specific things that they

15    state, you know, that have nothing to do with work, you know,

16    such as speak about his professionalism --

17          THE COURT:  Right.  But --

18          MR. RINCONES:  -- his honesty, his integrity --

19          THE COURT:  But can I say something here?

20          MR. RINCONES:  Yes, your Honor.

21          THE COURT:  When you sit here day in and day out, the

22    ones that are more surprising that they committed crimes are

23    the people who have this steady, family, good situation,

24    education, good jobs, all those things.  Those are factors that

25    normally mean somebody doesn't violate the law.  Any study that

1  you read into what are the characteristics of somebody who

2  violates the law, as to what segments of the population are

3  more likely to have violated the law, would include lack of a

4  job, dropout rates, drug usage, unstable family situation; you

5  can just go down the list.  The two defendants today, on the

6  other hand, have all the -- all the qualities of people that

7  have a low crime commission rate, because they're less likely

8  to feel -- to have the lack of guidance and the lack of

9  financial situation and the lack of education and all these

10 things that come with the lower crime rates.

11         **MR. RINCONES:**  I agree with the Court, your Honor.

12         **THE COURT:**  And most of the time, when it does happen

13 for those factors present in these two defendants, it's

14 sometimes -- it's usually greed; or the desire to have the

15 business do well.  And, you know, the thinking is, "What

16 difference does it make?  It's Mexico; that's the way they do

17 business," is the thought of so many people.  "I'm not doing

18 anything wrong, and some other company might do the same

19 thing," is what the thinking is.

20         **MR. RINCONES:**  And in discussing this case over --

21 I've been representing Mr. Perez for over a year, your Honor,

22 maybe a year and a half.  I think in this situation it -- I

23 wouldn't call it greed on his behalf.  I think that --

24         **THE COURT:**  Well, it's wanting the company to do

25 well.

1    **MR. RINCONES:**  He was wanting to keep a job.

2    **THE COURT:**  He wanted to make the sale.

3    **MR. RINCONES:**  Yes.  He wanted to have a job.

4    **THE COURT:**  Well, he had a job, and he wanted to make

5    sure that he did well at his job, and --

6    **MR. RINCONES:**  Right.

7    **THE COURT:**  -- the fact that they would be making the

8    business and that it -- it was them and not some other company.

9    **MR. RINCONES:**  Yes, your Honor.  He -- he wanted to

10   maintain a job.  And, you know, it's important that -- that

11   when the Court reads that he was one of 11 stockholders or one

12   of 12 stockholders, that Mr. Perez was a very minor

13   stockholder.

14   **THE COURT:**  I know that.  I'm not left --

15   **MR. RINCONES:**  He --

16   **THE COURT:**  -- with the impression that he was a

17   majority stockholder.

18   **MR. RINCONES:**  I think it's important for the Court

19   to -- to understand that Mr. Perez, as a side gig, as his

20   children were growing up, was a musician.  The weekends he

21   would play with local bands.  I think he tells me he got to

22   play with Grupo Mazz at some point, which is --

23   **THE DEFENDANT:**  Well, that was the start of the group

24   I played with.

25   **MR. RINCONES:**  Was the one -- started with the group.

1    So, he's very fond of that.

2              **THE COURT:**  Well --

3              **MR. RINCONES:**  What he did is he --

4              **THE COURT:**  -- this -- the starting of the group --

5    when you're a starter for a big group, that means you're a

6    pretty good group.

7              **MR. RINCONES:**  (**Laughter**)  And what he did, your

8    Honor, in order to buy his one share, was he sold -- he sold

9    his musical equipment.  And he tells me, "You know what?  I

10   should have stayed a musician.  I wouldn't have been involved

11   in this mess."  Unfortunately, you know, should have, could

12   have, would have is -- is part of the past, you know?  He does

13   recognize the problem he's in.

14             It's important to know also that --

15             **THE COURT:**  Well --

16             **MR. RINCONES:**  -- as a civilian --

17             **THE COURT:**  -- it isn't that he sold the -- his

18   instrument; it's that he fell for what so many people fall for,

19   which is, "There's nothing wrong with this; everybody's doing

20   it, and that's the way they do business in Mexico, and I'm not

21   doing anything wrong."  I mean, that -- that's the thinking.  I

22   mean, "Well, of course, I'm going to pay them."

23             **MR. RINCONES:**  Right.

24             **THE COURT:**  That, you know, that's what -- that's

25   part of the way they do business.  And, you know, they're doing

 1   it, cognizant of it, and if not they're going to go to somebody

 2   else.  However, when we take that attitude, we just mean it

 3   just continues to do the -- the way to do business.  And, you

 4   know, the amazing thing is sometimes people who are asking you

 5   for something, when you say, "No, I don't do business; I'm

 6   going to give you the best price, and you go back and you

 7   handle it any way you want to, but this is the price, and

 8   that's it," and sometimes you get respected a lot more by

 9   people than when you say, "Okay, just tell me how much you want

10   me to add here."  Because at some point those people have to

11   justify to somebody a cheaper price of something.

12             **MR. RINCONES:**  Right.

13             **THE COURT:**  Is there anything else you wanted to say?

14             **MR. RINCONES:**  Your Honor, I would want the Court to

15   know that on his free time Mr. Perez, you know, participated in

16   the community.  He was a --

17             **THE COURT:**  I know he did.

18             **MR. RINCONES:**  -- part of the Jaycees.

19             **THE COURT:**  I -- I've read it.

20             **MR. RINCONES:**  He was part of the Civil Air Patrol.

21             **THE COURT:**  He served -- he served in the military.

22             **MR. RINCONES:**  He served in the military.

23             **THE COURT:**  He's done everything you would want

24   somebody to do.

25             **MR. RINCONES:**  Part of the Elk Lodge.

1          **THE COURT:**  This is the only thing he's done, other

2     than the DWI, that would indicate there is any issue here.

3          **MR. RINCONES:**  That is correct.

4          **THE COURT:**  And DWI's are serious; don't get me

5     wrong.  But there is nothing else here other than, yes, he is

6     an outstanding family man, he's involved in the community,

7     everything.

8          **MR. RINCONES:**  Your Honor, by no means do we want the

9     Court to think that we are trying to minimize his

10    responsibility or the seriousness of this offense.  He takes

11    this very serious.  As you can see, he ended up in the hospital

12    for it already.  A look into the defendant's life history

13    clearly shows that he has respect for the law, as the Court

14    just stated.  We're respectfully asking the Court to consider

15    granting him a probated sentence as opposed to an

16    incarceration.  We believe that at his age, with his

17    background, and with his medical conditions, that would be

18    sufficient and adequate to secure the public from any further

19    crimes from him, and it will certainly deter him from anything

20    further.

21          **THE COURT:**  For him.  But it's not -- deterrence is

22    not just for him, it's for the public, also.  And, so, how do

23    we deter somebody?

24          **MR. RINCONES:**  Your Honor, Mr. Perez is not only

25    getting this judicial punishment; he's --

1          **THE COURT:**  I mean, there are people who strongly

2   believe that white-collar criminals get big breaks.  In fact,

3   that's probably one of the reasons of the <u>Sentencing Reform Act</u>

4   <u>of 1984</u>, which brought the guidelines into effect.  There was

5   the view that white-collar criminals tended to get much better

6   breaks than people who were not white-collar criminals.  And

7   that's a lot to do with why we have sentencing guidelines and

8   why we have the <u>Sentencing Reform Act of 1984</u>.

9          **MR. RINCONES:**  Yes, your Honor.

10         **THE COURT:**  That may seem like a long time ago to

11  you --

12         **MR. RINCONES:**  (Laughter)

13         **THE COURT:**  -- but certainly not to Mr. Perez and

14  myself, as to when 1984 was.

15         **MR. RINCONES:**  Your Honor, it's important to --

16         **THE COURT:**  You've -- what you failed to concentrate

17  on is, actually, there is a motion here that the Court could

18  take very seriously and I feel very strongly about.  And I do

19  tell defendants that when those motions get filed I consider

20  them extremely important; rather than spending all this other

21  time on things that really doesn't get us anyplace.  Because

22  I've read it, and I know it, and I know --

23         **MR. RINCONES:**  Yes, your Honor.

24         **THE COURT:**  -- Mr. Perez has got nothing else in his

25  background other than the DWI, which he addressed, but taking

1  some matters with regards to alcohol in hand and trying to

2  correct that and stuff, and so I -- I don't come out here

3  without having read the reports.

4        **MR. RINCONES:**  Yes, your Honor.  Well, in addition

5  to --

6        **THE COURT:**  In fact, unfortunately, when I'm asked by

7  friends, "What's the latest book you've read," I said, "I

8  really haven't read any books; I've read a lot of presentence

9  reports, and that has to do for my reading time."

10        **MR. RINCONES:**  Well, your Honor, we would want you to

11  consider what I've just explained to the Court, those sections

12  I outlined, along with the five -- sealed 5K that the

13  Government filed.  I think, if I may go into that --

14        **THE COURT:**  Well, I've read that also, and he -- he

15  didn't lie about anything, he was very forthright, he explained

16  the whole situation to them when confronted with it, and --

17        **MR. RINCONES:**  Well, I -- I think it goes beyond --

18        **THE COURT:**  -- and, frankly, I think he did it

19  because he -- it shows that he didn't really think that this

20  was a big deal.  I mean, this is how he -- these people do

21  business, and so he said, yeah, they wanted a fee, and there is

22  a referral fee.  There is a lot of that in both of these

23  reports of, "We all know there is a referral fee," or "the

24  fee," or whatever, "that gets charged, and this is what we were

25  doing, and that was that."

36

1          **MR. RINCONES:**  Your Honor, I understand what the

2  Court is telling us, but I -- I think that we want to stress

3  out some of his participation for this 5K.

4          **THE COURT:**  Well, frankly, the case for the other two

5  probably would have been very difficult to make, and, yes, I

6  understand that.

7          **MR. RINCONES:**  Well, your Honor, it's important for

8  the Court to know that Mr. Perez, you know, attended at least

9  10 debriefing sessions.

10          **MR. SALAZAR:**  Your Honor, if I may interrupt, I -- I

11  believe that we're getting into a sealed motion, and if the

12  Government -- if the Court would allow us, I have two agents

13  here that could answer any questions, as well, and perhaps we

14  could take all of this at the bench, your Honor?

15          **THE COURT:**  Right.  And the reason they're sealed is

16  usually for the protection of the defendant, but, apparently,

17  his lawyer doesn't find that necessary.  But I -- I think we

18  probably should discuss it up here.

19          **MR. SALAZAR:**  Yes, Judge.  And should I bring the

20  agents up to the desk?

21          **THE COURT:**  Yes.

22          **MR. RINCONES:**  May we approach, your Honor?

23          **THE COURT:**  No, I wouldn't have -- yes, of course.  I

24  wouldn't have a conversation with them without you up here.

25  //

37

1      **(Sealed bench conference omitted from 3:32 p.m. until**

2      **3:41 p.m.)**

3              THE COURT:  Mr. Rincones, did you want to say

4      anything else?

5              MR. RINCONES:  No, your Honor.  I would just ask the

6      Court to consider everything that was discussed here

7      previously, and I would ask the Court to consider sentencing my

8      client to a probated sentence.

9              THE COURT:  Mr. Perez, did you want to say anything

10     else?

11             THE DEFENDANT:  No, sir, just that -- that I regret

12     what happened, and again I repeat it was a bad business

13     decision, and I guarantee you, given that opportunity, it will

14     never, ever happen again, especially, like I said, I put my

15     family to shame.

16             THE COURT:  That's the hard part that happens in

17     these cases, Mr. Perez, and it's not just your case.  It's in

18     every single case.  A family serves the sentence with the

19     individuals that get sentenced.

20             THE DEFENDANT:  I found out -- that out all during

21     all this time with the situation my wife's in and -- and the

22     situation I'm in, also, that that's -- it's very hard, and the

23     one that takes it all, really, in reality, is the family.

24             THE COURT:  No question about it.

25             THE DEFENDANT:  I had all my family here on Monday.

1    They had to go back because of school, because of the kids;

2    because I have the full support of my family.  In the

3    background, the back bench, as you see, the majority is my

4    family, and -- because they're here to support me.

5             THE COURT:  And, you know, I have to tell you that

6    the fact that some of them aren't here today, we wouldn't be

7    doing our job as judges -- most of the time people are here who

8    don't have their families in this country, but I know that

9    their family is still there, and so it doesn't really make a

10   difference whether they're in the courtroom or not, at least

11   from my standpoint.  I realize that the families are the ones

12   that suffer a lot, and so they always get taken into

13   consideration, whether they're in the courtroom or not.  In

14   fact, I have to remind myself that most of my defendants in

15   this courtroom can't have their families here because their

16   families would be breaking the law by coming into the United

17   States illegally.

18             Anything else?  Does the Government want to say

19   anything else?

20            MR. CESTARO:  Only, your Honor, that the Government

21   moves for the one-point reduction pursuant to --

22            THE COURT:  For the --

23            MR. CESTARO:  -- timeliness of the plea.

24            THE COURT:  -- extra point for acceptance?

25            MR. CESTARO:  For the timeliness of plea.  Yes, sir.

1          **THE COURT:**  All right.  Court's ready to proceed.

2    The base offense level based on what the defendant's pled

3    guilty to here is 12.  Pursuant to 2C1.1(b)(1) there is a two-

4    level increase based on the number of, quote, "bribes."

5    Pursuant to 2C1.1(b)(2), based on the amount of money involved,

6    there is a plus 14.  The paragraph 46 four-level adjustment

7    upward does not apply here, as the Court has already ruled.

8    The adjusted offense level is 28.  There is a minus two, as

9    well as the extra minus one.  Total offense level is 25.  His

10   Criminal History Category is I.  The Court will adopt

11   paragraphs 43 to 56 of this presentence investigation report,

12   with the exception of paragraphs 46, 50, and -- and total

13   offense should really have a number on it, but it doesn't, but

14   that paragraph is not adopted either.

15          So, with a 25, Criminal History Category I, his range

16   becomes 57 to 71 months, which is actually 57 to 60 months,

17   because the maximum in this case is 60 months.  The Court,

18   granting a motion that has been filed, is going to find that

19   the appropriate sentence in this case is a sentence of three

20   years' probation under the conditions which have been adopted

21   as standard in the Southern District of Texas, to include all

22   statutory requirements.  There will be a $100 special

23   assessment against him as required by law.  The reasons I've

24   chosen this sentence is because I have considered all the

25   matters that the Court needs to consider under Title 18,

40

1   Section 3553(a), as well as all of the documents and motions

2   that have been filed here, and finds that it's the appropriate

3   sentence.

4           Mr. Perez, I want you to understand that if you would

5   like to appeal this sentence you have within 14 days from the

6   entry of judgment in this case within which to do that.  The

7   way that you do that, sir, is by filing a written notice of

8   appeal with the Clerk of the Court within that time period.  If

9   you're unable to afford the cost of an appeal, within that time

10  period, you will also have to file a motion to proceed in forma

11  pauperis in which you indicate to the Court that you're unable

12  to afford the cost of an appeal, and if the Court were to find

13  that you are unable to afford the cost of an appeal, the Court

14  would appoint an attorney to represent you at no cost to you,

15  as well as bear the cost of the appeal.

16          I will indicate to the probation office that if at

17  the usual time when these are assessed, if there is no need for

18  supervision, they can make the recommendation that it be

19  probation without supervision.

20          Did you understand all that, Mr. Perez?

21      **THE DEFENDANT:**  Yes, sir, I did.

22      **THE COURT:**  I hope that you don't end up at the

23  hospital today like you did the last time you were here.

24      **(Laughter)**

25      **THE COURT:**  I hope that everything will remain good

41

1    with your health and that you take care of it and that you

2    continue taking care of your family.

3              **THE DEFENDANT:**  I thank you very much, your Honor.

4              **THE COURT:**  And whenever you get an opportunity, you

5    tell people that you know that are in business that until they

6    stop doing what was done here, thinking that that's the only

7    way you're going to make a sale, the situation on this side of

8    the border with dealing with Mexico will continue the same.

9              **THE DEFENDANT:**  Well, your Honor, it's been taken

10   care of, because I -- you know, we have spoke to our clients

11   that -- nothing.

12             **THE COURT:**  And I suspect your competitors also know

13   that the Government is on the watch now.  And probably that has

14   been fixed, to some extent, also, if not completely done

15   already.

16             **THE DEFENDANT:**  Probably so.

17             **THE COURT:**  If you all don't have anything else, you

18   all can be excused.  Thank you.

19             **MR. RINCONES:**  Thank you, your Honor.

20             **THE DEFENDANT:**  Thank you, your Honor.

21       **(Proceeding was adjourned at 3:47 p.m.)**

22

23

24

25

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          February 9, 2017_


                    TONI HUDSON, TRANSCRIBER